```
                                                FILED
                                         2012 SEP 25  PM 4: 23
                                         CLERK U.S. DISTRICT COURT
                                          CENTRAL DIST. OF CALIF.
                                               LOS ANGELES
                                         BY:_____
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2012 Grand Jury

**CR12-0921**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. |
| Plaintiff, | ) <u>I N D I C T M E N T</u> |
| v. | ) [18 U.S.C. § 1349: Conspiracy to Commit Health Care Fraud; 18 U.S.C. § 1035: False Statements Affecting Health Care Program; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to be Done; 18 U.S.C. § 982: Criminal Forfeiture] |
| RAJINDER SINGH PAUL, aka "Raj Paul," aka "Raj," and BALJIT KAUR PAUL, | |
| Defendants. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. §§ 1349, 2]

A.   <u>INTRODUCTORY ALLEGATIONS</u>

At all times relevant to this Indictment:

<u>The Conspirators</u>

1.   Defendant RAJINDER SINGH PAUL ("R. PAUL"), also known as ("aka") "Raj Paul," aka "Raj," owned, operated, and was the president and a shareholder of a durable medical equipment ("DME") wholesale supply company called Major's Wholesale Medical

1  Supply, Inc., later known as AHPK, Inc. ("Major's Wholesale").
2  Major's Wholesale did business as "Major's Mobisist."
3      2. Defendant BALJIT KAUR PAUL ("B. PAUL") was married to
4  defendant R. PAUL. Defendant B. PAUL was a vice president and
5  shareholder of Major's Wholesale.
6      3. Major's Wholesale's business address was 30580 Mirasol
7  Drive, Redlands, California, and its offices were located at 3002
8  Inland Empire Boulevard, Ontario, California, both of which were
9  located within the Central District of California.
10     4. In or about July 2008, defendants R. PAUL and B. PAUL
11 sold the assets of Major's Wholesale to new owners, Major's
12 Wholesale Medical Supply LLC ("Major's LLC"). Defendants R. PAUL
13 and B. PAUL remained associated with Major's LLC as consultants
14 until Major's LLC terminated their employment in or about
15 February 2009. The term "Major's" as used herein refers to
16 Major's Wholesale and Major's LLC during the time period
17 defendants R. PAUL and B. PAUL were associated with them.
18     5. A co-conspirator known to the Grand Jury ("CC1") owned
19 and operated several fraudulent DME supply companies within the
20 Central District of California. CC1 operated these DME supply
21 companies through "straw" or nominee owners, and used the
22 companies to submit false and fraudulent claims to the Medicare
23 Program ("Medicare") for expensive, high-end power wheelchairs
24 and other DME. CC1's DME companies purchased some of the power
25 wheelchairs and other DME that they billed to Medicare from
26 Major's.
27     6. Another co-conspirator known to the Grand Jury ("CC2")
28 owned and operated a fraudulent DME supply company located in the

Central District of California, through which CC2 submitted false and fraudulent claims to Medicare for power wheelchairs and other DME, some of which CC2 purchased from Major's.

7. Other co-conspirators known and unknown to the Grand Jury also owned and operated fraudulent DME supply companies that purchased from Major's power wheelchairs and other DME that they billed to Medicare.

The Medicare Program

8. Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS").

9. CMS contracted with private insurance companies to:

   a. certify DME providers for participation in the Medicare program and monitor their compliance with Medicare standards;

   b. process and pay claims; and

   c. perform program safeguard functions, such as identifying and reviewing suspicious claims.

10. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each Medicare beneficiary was given a Health Identification Card ("HICN") containing a unique identification number.

11. DME companies, physicians, and other health care providers that provided medical services which were reimb Medicare were referred to as Medicare "providers."

12. To obtain payment from Medicare, a DME company first had to apply for and obtain a provider number. By signing the provider application, the DME company agreed to abide by all Medicare rules and regulations, including those rules set forth in the Medicare Program Integrity Manual.

13. If Medicare approved a provider's application, Medicare would assign the provider a Medicare provider number, enabling the provider (such as a DME supply company) to submit claims to Medicare for services and supplies provided to Medicare beneficiaries.

14. To obtain and maintain their Medicare provider numbers and billing privileges, DME suppliers had to meet Medicare standards for participation. These standards required DME providers, among other things, to:

   a. be in compliance with all applicable Federal and State licensure and regulatory requirements;

   b. fill orders from their own inventory or contract with other companies for the purchase of items necessary to fill the orders;

   c. permit Medicare or its contractors to conduct on-site inspections to ascertain the DME providers' compliance with Medicare standards;

   d. be responsible for delivery of the DME to the beneficiary and maintain proof of delivery;

   e. disclose to the government any person having an ownership, financial, or controlling interest in the suppliers; and,

f.   agree to furnish Medicare with information required by any Medicare statute or regulation. The Medicare contractor responsible for evaluating and certifying DME providers' compliance with these standards was Palmetto GBA ("Palmetto").

15.   From in or about January 2003 through in or about September 2006, CIGNA processed and paid Medicare DME claims in Southern California. From in or about October 2006 onward, Noridian Administrative Services ("Noridian") performed this function.

16.   Most DME providers submitted their claims electronically pursuant to an agreement with Medicare that they would submit claims that were accurate, complete, and truthful.

17.   Medicare paid DME providers only for DME that was medically necessary to the treatment of a beneficiary's illness or injury, was prescribed by a beneficiary's physician, and was provided by the DME provider in accordance with Medicare regulations and guidelines that governed whether a particular item or service would be paid by Medicare.

18.   Medicare rules and regulations required DME providers to provide power wheelchairs and other DME to the Medicare beneficiaries before the providers submitted the power wheelchair and DME claims to Medicare.

19.   To bill Medicare for DME it provided to a beneficiary, a DME provider was required to submit a claim (Form 1500) to CIGNA or Noridian. Medicare required claims to be truthful, complete, and not misleading. In addition, when a claim was submitted, the provider was required to certify that the services

or supplies covered by the claim were medically necessary and furnished by the provider prior to billing Medicare.

20. Medicare required a claim for payment to set forth, among other things, the beneficiary's name and HICN, the type of DME provided to the beneficiary, the date the DME was provided, and the name and unique physician identification number ("UPIN") of the physician who prescribed or ordered the DME.

21. Medicare rules and regulations also required DME suppliers to maintain proof of delivery documentation in their files for seven years, and provide proof of delivery to Medicare or its contractors upon request. If the DME provider could not provide appropriate proof of delivery, Medicare would deny the services the DME provider billed to Medicare and issue an overpayment request to the supplier. A DME supplier who received an overpayment request from Medicare was required to return the money it received from Medicare for a particular claim or group of claims.

22. An example of proof of delivery to a beneficiary was a signed delivery slip which Medicare recommended include:

    a. the Medicare beneficiary's name;
    b. the quantity of DME delivered;
    c. a detailed description of the DME that the DME provider delivered to the beneficiary;
    d. the brand name of the DME; and
    e. the serial number of the DME.

Medicare required that the date of the signature on the delivery slip be the date that the DME was received by the beneficiary. Medicare required that in instances where the DME provider

delivered the DME directly to the beneficiary, the date the beneficiary received the DME was the date of service on the claim.

B. <u>THE OBJECT OF THE CONSPIRACY</u>

23. Beginning in or about September 2002, and continuing through in or about February 2009, in Los Angeles County, within the Central District of California, and elsewhere, defendants R. PAUL, B. PAUL, CC1, and CC2, together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to commit, and aided and abetted others in committing, health care fraud, in violation of Title 18, United States Code, Section 1347.

C. <u>THE MANNER AND MEANS OF THE CONSPIRACY</u>

24. The object of the conspiracy was carried out, in substance, as follows:

   a. Major's sold power wheelchairs and other DME at low prices to attract the business of DME supply companies. Major's sold power wheelchairs to DME supply companies for between approximately $850 to $1,000 per power wheelchair.

   b. DME supply companies purchased power wheelchairs from Major's which they billed to Medicare for between approximately $3,000 to $6,000 per wheelchair. Some of these companies defrauded Medicare through the submission of false and fraudulent claims to Medicare for DME that was not medically necessary or provided to the Medicare beneficiaries.

   c. To ensure that Medicare paid them and to maximize their profits, some of these same DME supply companies submitted claims to Medicare for power wheelchairs and other DME before

they had actually purchased the equipment or delivered it to Medicare beneficiaries, in violation of Medicare rules and regulations.

   d. Defendants R. PAUL and B. PAUL knew that the DME supply companies would not pay Major's unless Medicare first paid the DME supply companies. In order to attract and keep business, and prevent Medicare from issuing overpayment notices to or auditing their DME supply company customers, revoking the DME supply companies' Medicare provider numbers, or otherwise preventing the DME supply companies from receiving money from Medicare and paying Major's, defendants R. PAUL and B. PAUL backdated, altered, and falsified invoices for numerous DME supply company customers. Knowing that the companies had already submitted claims to Medicare for power wheelchairs and other DME, defendants R. PAUL and B. PAUL provided their DME supply company customers with false invoices showing that the companies had purchased DME from Major's earlier then they in fact had done so.

   e. Defendants R. PAUL and B. PAUL also provided the DME supply companies with false inventory purchase agreements that showed that the companies had credit limits with Major's higher than the credit actually extended to the companies. The DME supply companies then submitted the false inventory purchase agreements to Medicare to meet one of the Medicare standards necessary for the companies to obtain and maintain their Medicare provider numbers, namely, that they had contracts to purchase the DME they needed to fill the orders that they submitted to Medicare.

  f. Defendants R. PAUL and B. PAUL sold power wheelchairs and other DME to CC1's DME supply companies, knowing that CC1 owned and operated these companies in the names of straw or nominee owners, which allowed CC1 to conceal from Medicare that CC1 was the true owner and operator of the companies.

  g. In many cases, CC1 used these DME companies to submit claims to Medicare for power wheelchairs and other DME before CC1 purchased the equipment from Major's or delivered it to the Medicare beneficiaries. CC1 then contacted either defendant R. PAUL or defendant B. PAUL, and requested that they provide CC1 with backdated, altered, or falsified invoices for the DME.

  h. Defendants R. PAUL and B. PAUL routinely provided CC1 with backdated, altered, and falsified invoices for CC1's DME supply companies, which CC1 maintained in the companies' files to create the false appearance that the companies had purchased and delivered the DME to the beneficiaries before they billed the equipment to Medicare.

  i. In addition, defendants R. PAUL and B. PAUL created other false invoices for CC2's fraudulent DME company, including a backdated invoice for a power wheelchair that CC2's DME company claimed it provided to Medicare beneficiary Roger K., which Roger K. did not need and never received from CC2's DME company.

  j. On occasions when Medicare requested documents from CC1's and CC2's DME supply companies to support the claims that they had submitted to Medicare, defendant B. PAUL provided CC1 and CC2 with backdated, altered, and fabricated invoices,

knowing that the invoices would be used to falsely represent to Medicare that CC1's and CC2's companies (1) had purchased DME from Major's before they submitted claims for the equipment to Medicare; and (2) were in compliance with Medicare requirements, thereby allowing them to maintain their Medicare provider numbers and continue to defraud Medicare.

k. Defendants R. PAUL and B. PAUL also provided DME supply companies with false invoices for power wheelchairs and other DME that the companies never purchased from Major's. Defendants R. PAUL, B. PAUL, and employees acting at their direction created these false invoices by using invoice numbers from old invoices or serial numbers from DME that Major's had already sold or not yet received from its manufacturers.

l. On several occasions, CC1 purchased power wheelchairs and other DME from other sources, and did not have invoices to prove that CC1 had purchased the equipment. At CC1's request, defendant B. PAUL agreed to provide and did provide CC1 with backdated, altered, or fabricated invoices for the equipment.

25. Over the course of the conspiracy, defendants R. PAUL and B. PAUL created and caused the creation of over 600 backdated, altered, and falsified invoices for approximately 170 customers of Major's.

26. Over the course of the conspiracy, CC1's and CC2's DME supply companies submitted approximately $16,662,143 in false and fraudulent claims to Medicare, and Medicare paid them approximately $9,743,609.42 on these false claims.

## COUNT TWO

[18 U.S.C. §§ 1035(a), 2]

27. The Grand Jury incorporates by reference and re-alleges paragraphs 1 through 22 and paragraphs 24 through 26 above of this Indictment as though set forth in their entirety herein.

28. On or about June 16, 2008, in Los Angeles County, within the Central District of California, and elsewhere, in a matter involving a health care benefit program, specifically Medicare, and in connection with the delivery of and payment for a health care benefit, item, and service, defendants R. PAUL and B. PAUL, aiding and abetting CC2, knowingly and willfully falsified, concealed, and covered up by trick, scheme, or device a material fact, and made a materially false writing and document, knowing the same to contain a materially false, fictitious, and fraudulent statement and entry. Specifically, on or about June 16, 2008, defendants R. PAUL and B. PAUL created Major's invoice number 56240, which was backdated to June 6, 2008, for CC2 to submit to Medicare to give the false appearance that CC2's DME supply company had purchased power wheelchairs from Major's on or about June 6, 2008.

## FORFEITURE ALLEGATION

[18 U.S.C. § 982(a)(7)]

29. The Grand Jury hereby realleges and incorporates by reference counts one and two of this Indictment as though fully set forth herein, for the purpose of alleging forfeiture, pursuant to the provisions of Title 18, United States Code, Section 982(a)(7).

30. Counts one and two of this Indictment allege acts or activities constituting federal health care fraud offenses pursuant to Title 18, United States Code, Sections 1035, 1347, and 1349. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of a federal health care fraud offense, defendants R. PAUL and B. PAUL shall forfeit to the United States of America:

    a. All right, title, and interest in any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense; and

    b. A sum of money equal to the total amount of gross proceeds derived from such offense.

31. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), a defendant so convicted shall forfeit substitute property, up to the value of the amount described in paragraph 30, if, by any act or omission of said defendant, the property described in paragraph 30, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or

deposited with a third party; has been placed beyond the jurisdiction of this court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

ANDRÉ BIROTTE JR.
United States Attorney

*R. Dugdale* (signature)

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RICHARD ROBINSON
Assistant United States Attorney
Chief, Major Frauds Section

CONSUELO WOODHEAD
Assistant United States Attorney
Deputy Chief, Major Frauds Section

SAMUEL SHELDON
Deputy Chief, Fraud Section
United States Department of Justice

BENTON CURTIS
Assistant Deputy Chief, Fraud Section
United States Department of Justice

JONATHAN T. BAUM
Trial Attorney, Fraud Section
United States Department of Justice